UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
KIM PHAN,                          )
                                   )
          Plaintiff,               )    CIVIL ACTION NO.
                                   )    12-11490-DPW
     v.                            )
                                   )
METROPOLITAN LIFE INSURANCE, CO.,  )
                                   )
          Defendant.               )
```

MEMORANDUM & ORDER
February 18, 2014

     The Defendant, Metropolitan Life Insurance, Co., issued a
life insurance policy to Tuc Phan.  That policy provided a basic
"death benefit" and included a rider providing for payment of an
additional amount in the case of "accidental death."  The policy
also included an exclusion that the accidental death benefit
would not be available if death was in "any way" the result of
physical illness.

     After Mr. Phan died on August 10, 2011, MetLife paid the
amount of the basic death benefit to his surviving spouse and
insurance beneficiary, Kim Phan--the plaintiff.  Mrs. Phan made a
claim for payment of the additional insurance amount provided
under the Accidental Death Rider.

     When MetLife denied that claim, contending that the
circumstances and cause of Mr. Phan's death fell outside of the
scope of the rider's coverage, Mrs. Phan brought this lawsuit,
asserting claims of breach of contract, breach of the covenant of

-1-

good faith and fair dealing, and violation of Massachusetts
General Law, Chapter 93A.  MetLife has now moved for summary
judgment on all of Mrs. Phan's claims.

## I. BACKGROUND

### A.   *The Life Insurance Policy*

The decedent, Tuc Phan, was an insured individual and
covered person under a life insurance policy issued by MetLife to
Connecticut National Bank, N.A.  In addition to a general "death
benefit" payable upon the death of a covered person regardless of
cause, the insurance policy contains a rider providing an
"Accidental Death Benefit" in the amount of $50,000.  The
Accidental Death Rider explains that "[i]f a Covered Person dies
in an accident, [MetLife] will pay Accidental Death Benefits . .
. if that accident is the sole cause of death."  The "Exclusions"
section of the rider provides that MetLife "will not pay for a
loss of life if it in any way results from, or is caused or
contributed to:  by . . . physical or mental illness, diagnosis
of or treatment for the illness."[1]

---

[1] In her opposition briefing, Mrs. Phan contends that
MetLife has failed to produce certain sections of the life
insurance contract, including specifically Connecticut National
Bank, N.A.'s application for group coverage.  Despite the close
of discovery, Mrs. Phan never raised this issue before she filed
her opposition briefing.  Consequently, I consider this issue
waived.  Further, my own review of the life insurance policy in
the record indicates it is complete.  The allegedly missing
application is located at Page 17 of Exhibit 1 to MetLife's
memorandum in support of its motion for summary judgment.

**B.    Tuc Phan's Death**

On August 10, 2011, Trooper George Katsarakes of the
Massachusetts State Police was alerted to an unidentified
individual heading the wrong way on the northbound lane of
Interstate 95 in Boxford, Massachusetts.  A fair reading of
Trooper Katsarakes' report indicates that, while proceeding to
the area, he observed one vehicle pulled over in the North bound
breakdown lane of Interstate 95 and what appeared to be the tail
lights of another vehicle in the brush lined border of the woods.
It is unclear from the narrative report whether either of these
vehicles had been the car reported going the wrong way on
Interstate 95.  A chart attached to the report suggests that Mr.
Phan's car crossed the median strip and the northbound lane
heading south before coming to rest at the border of the woods.[2]

Trooper Katsarakes reported that he approached a man
(presumably in the car in the breakdown lane) who indicated that
there was a male driver (later identified as Mr. Phan) slumped
over the front seat (presumably of the car in the brush bordering
the road) with his seatbelt still secured.  Trooper Katsarakes
reported that the airbag had not deployed and the damage to the
vehicle was less than $1,000.  The trooper found Mr. Phan without

---

[2] Because the circumstances of the incident in the end prove
immaterial to the outcome of the motion before me, I need not
strain to fill in the evidentiary blanks in the record regarding
the incident and whether it may be characterized as an accident.

a pulse or signs of breathing, removed him from his vehicle, and began to administer CPR on-scene until the arrival of emergency medical services.  EMS performed acute cardiovascular life support ("ACLS"); despite these efforts and the administration of five doses of epinephrine, Mr. Phan remained asystolic--meaning that he had no cardiac activity.

EMS transported Mr. Phan to Beverly Hospital where ACLS protocol was continued.  Upon arrival at the hospital, Mr. Phan was found pulseless and asystolic with his pupils fixed and dilated, but without obvious signs of trauma or open wounds.  Mr. Phan was administered calcium and bicarbonate without any change in his condition.  At 10:48 pm, given that the patient was asystolic for more than 40 minutes prior to arrival at the hospital and that this condition persisted after arrival in the emergency department, Mr. Phan was pronounced dead by the treating physician.

On August 12, 2011, an autopsy was performed by Dr. Henry Nields, Chief Medical Examiner for the Commonwealth of Massachusetts.  In his autopsy report, Dr. Nields listed the "Cause of Death" as:

    I.   Hypertensive and Atherosclerotic Cardiovascular Disease
    II.  Blunt Trauma to Chest

Dr. Nields reported the manner of death as: "Accident (Driver of Motor Vehicle Drove Off Highway Into a Wooded Area.)"

Under "Injuries, external and internal," Dr. Nields stated

-4-

that "[t]here is an approximately 1 inch laceration to the portal area of the liver.  There are approximately 250 cc of blood in the abdominal cavity."

Under "Cardiovascular System," Dr. Nields observed that:

There is mild atherosclerosis of the aorta and iliac arteries.  The vena cava and pulmonary arteries are without thrombus or embolus.  The heart weighs 530 g and has a normal distribution of right predominant coronary arteries with 85-90% stenosis of the proximal left anterior descending coronary artery and 10% stenosis of the left circumflex and right coronary arteries.  The myocardium is uniform, firm and reddish-brown.  The left ventricular wall measures 1.3 cm in thickness.  The endocardial surfaces and four cardiac valves are unremarkable.

A medical examiners' certificate of death was issued on August 16, 2011 by the Commonwealth of Massachusetts.  That certificate listed the "Immediate Cause" of death as "Hypertensive and Atherosclerotic Cardiovascular Disease."  It listed "Blunt Trauma to Torso" as an "other significant condition contributing to death."

## C.   *Mrs. Phan's Claim*

On or about August 31, 2011, Mrs. Phan submitted a life insurance claim form to MetLife.  MetLife paid the amount of the basic death benefit to Mrs. Phan on September 13, 2011 and requested that Mrs. Phan provide a copy of the autopsy report and accident report.  After receiving these materials, MetLife informed Mrs. Phan by letter dated February 24, 2012 that they were denying her claim for the "Accidental Death Benefit."

MetLife explained that, under the terms of the Accidental Death Rider "even if there was an accidental component to the death, the accident was not the 'sole cause of death' as the medical examiner's findings [was] that cardiovascular disease was the immediate cause of death . . . [T]he physical exclusion applies for the same reason.  The death resulted from, or was caused or contributed to by the decedent's heart disease."

**D.   *MetLife's Expert Declaration***

In support of its motion for summary judgment, MetLife has submitted an affidavit from Dr. Bruce Goldman, a physician specializing in autopsy pathology and cardiovascular pathology. [Dkt. 26-14, ¶ 1].  Dr. Goldman opined that:

> the cause of death in this case is hypertensive and atherosclerotic cardiovascular disease.  Mr. Phan's cardiac hypertrophy is demonstrated by the finding of severe cardiomegaly, *i.e.* that his heart weighed 530 grams (a normal adult heart typically weighs less than 400 grams).  The 'severe single vessel coronary artery sclerosis' is demonstrated by the finding of an '85-90% stenosis of [Mr. Phan's] proximal left anterior descending coronary artery.'

Dr. Goldman also opined that:

> [T]he liver injury and hemoperitoneum found at autopsy were the result of resuscitative efforts.  The location of the laceration of the liver on the portal (deep undersurface) of the liver is most consistent with injury related to 'aggressive' chest compression during CPR . . . If this injury had occurred because of the automobile crash, then one would expect evidence of other trauma, *e.g.*, to the body wall, chest, and/or anterior surface of the liver, none of which was evident at autopsy . . . Finally, it cannot be postulated that Mr. Phan died as a result of the liver injury, since the amount of blood found in the abdomen

is not sufficient to cause death from hypovolemic
shock, which typically requires loss of at least a
quarter of blood volume (*i.e.* approximately 1.5 L or
more).

### E.   The Plaintiff's Expert Declaration

As part of her opposition to MetLife's motion for summary

judgment, Mrs. Phan submitted an expert declaration from Dr.

Robert Belliveau, M.D.  In that declaration, Dr. Belliveau opined

that:

> Mr. Phan died accidentally due to blunt trauma causing
> a sudden and unexpected cardiac event in reaction to
> his vehicle leaving the road.  Mr. Phan did not die of
> medical disease of any kind, including renal disease or
> arteriosclerotic cardiovascular disease . . . There is
> no evidence in the medical examiner's report or in any
> other document that I reviewed stating that a
> thrombosis totally cut-off the blood supply to Mr.
> Phan's heart causing a sudden cardiac arrest . . . The
> medical examiner's report states that Mr. Phan had an
> 85% to 90% stenosis of the proximal left anterior
> descending coronary artery.  I have never observed a
> sudden cardiac death from the proximal left anterior
> descending coronary artery without a thrombosis.  For
> this reason . . . a thrombosis or occlusion to the
> proximal left anterior descending coronary artery did
> not cause a sudden cardiac arrest.

## II. STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 "mandates the entry of

summary judgment, after adequate time for discovery and upon

motion, against a party who fails to make a showing sufficient to

establish the existence of an element essential to that party's

case, and on which that party will bear the burden of proof at

trial."  *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 322 (1986).  The

question is whether, viewing the facts in the light most

favorable to the nonmoving party, there is a "genuine dispute as to any material fact."  Fed. R. Civ. P. 56(a); *Casas Office Machines, Inc.* v. *Mita Copystar Am., Inc.*, 42 F.3d 668, 684 (1st Cir. 1994).

### III. ANALYSIS

In her complaint, Mrs. Phan asserts three causes of action: (1) Breach of Contract; (2) Breach of the Covenant of Good Faith and Fair Dealing; and (3) Violation of Massachusetts General Law, Chapter 93A, Section 9.  At the outset, however, I must determine the applicable source for the rules of decision.

### A.    *Choice of Law*

Mrs. Phan has come to argue that MetLife improperly relies upon Massachusetts law in support of its motion for summary judgment and that Rhode Island law applies instead.[3]  The reason Defendant has chosen Massachusetts law is understandable; Mrs. Phan asserted her claims and has litigated this case under Massachusetts law.  Plaintiff's counsel set forth the basis for Mrs. Phan's claims in a Chapter 93A letter sent to MetLife.  That letter, which provides the predicate for Count II of her complaint under Massachusetts statutory law, cites almost

---

[3] Mrs. Phan's position is that the life insurance policy was delivered in Rhode Island, that the original policy holder was Connecticut National Bank, N.A., DBA Shawmut Bank of Rhode Island, Trustee, an entity which was doing business in Rhode Island, and that these facts require the application of Rhode Island law.

exclusively to Massachusetts case-law and statutes, and makes no reference to Rhode Island law.  In Count II of her complaint, Plaintiff is even more explicit about the applicability of Massachusetts common law, alleging that: "Metlife breached the covenant of good faith and fair dealing implied in the terms of the Life Policy under *the law of the Commonwealth of Massachusetts* by failing to pay benefits due as reasonably expected by an insured under that Life Policy." (Emphasis added.)  Despite the belated assertion of Rhode Island law in the summary judgment briefing, no effort has ever been made by the Plaintiff to amend her complaint to allege Rhode Island as the source of law.

I need not determine whether to indulge the plaintiff's effort to execute a previously unannounced about-face regarding the applicable law.  "It is axiomatic that '[t]he first step in performing a choice of law analysis is to determine whether there is a conflict between the substantive laws of the interested jurisdictions.'"  *O'Connell* v. *Federal Ins. Co.*, 484 F. Supp. 2d 223, 225 n.3, (D. Mass. 2007) (citing *Millipore Corp.* v. *Travelers Indemnity Co.*, 115 F.3d 21, 29 (1st Cir. 1997)).  As will be seen below, I discern no distinction between the law of Rhode Island and Massachusetts that makes any difference in this case as pled and so I need not address the dispute between the

parties on this point.[4]  *See Lambert* v. *Kysar*, 983 F.2d 1110, 1114 (1st Cir. 1993) ("We need not resolve the issue [of which state law applies], however, as the outcome is the same under the substantive law of either jurisdiction.").

**B.   *Breach of Contract and of the Covenant of Good Faith***

   1.   Interpretation of the Contract

   "[T]he rules governing the interpretation of insurance contracts are the same as those governing the interpretation of any other contract." *Sullivan* v. *Southland Life Ins. Co.*, 854 N.E.2d 138, 141 (Mass. App. Ct. 2006) (internal citation and quotation marks omitted).[5]

   In a coverage dispute, the "insured bears the initial burden of proving that the claimed loss falls within the coverage of the insurance policy." *Boazova* v. *Safety Ins. Co.*, 968 N.E.2d 385, 390 (Mass. 2012).[6]  If an insured carries this initial burden,

---

   [4] Rhode Island law does provide for a common law bad faith claim which is distinct from a claim for breach of the implied covenant of good faith and fair dealing.  *See Zarrella* v. *Minnesota Mut. Life Ins. Co.*, 824 A.2d 1249, 1261 (R.I. 2003). Mrs. Phan, however, has not pled any such claim.  In any event, as will become clear in this Memorandum, even if this claim had been pled, it would not survive summary judgment.  *See* Note 16, *infra.*

   [5] *Accord Gregelevich* v. *Progressive Northwestern Insurance Co.*, 882 A.2d 594, 595 (R.I. 2005) (Rhode Island courts construe the terms of an insurance policy "according to the same rules of construction governing contracts.").

   [6] *Accord General Accident Insurance Company of America* v. *American National Fireproofing, Inc.*, 716 A.2d 751, 757 (R.I. 1998) ("[T]he insured seeking to establish coverage bears the

"the burden then shifts to the insurer to show that a separate exclusion to coverage is applicable to the particular circumstances of the case." *Id.* at 390.[7]

Here, the relevant coverage provision requires Mrs. Phan to show that Mr. Phan died "in an accident" and that "that accident is the sole cause of death" and excludes coverage if MetLife is able to demonstrate that the loss of life is "caused or contributed to by . . . physical . . . illness."

Mrs. Phan contends that this clause is ambiguous because the terms "accident" and "in an accident" are not defined within the life insurance policy and that this ambiguity precludes entry of summary judgment. While it is true that the precise contours of the meaning of the term "accident" are not well defined, *see Wickman* v. *Northwestern Nat. Ins. Co.*, 908 F.2d 1077, 1086-87 (1st Cir. 1990) ("Probably the best definition is [Justice] Cardozo's tautology that an accident is what the public calls an accident."),[8] I need not mark with precision the outer bounds of

---

burden of proving a prima facie case, including . . . the existence . . . of a policy.").

[7] *Accord General Accident Insurance*, 716 A.2d at 757 ("The insurer then bears the burden of proving the applicability of policy exclusions and limitations in order to avoid an adverse judgment.").

[8] Drawing language from a Pennsylvania Supreme Court case, the *Wickman* court asked: "What is an accident?  Everyone knows what an accident is until the word comes up in court.  Then it becomes a mysterious phenomenon, and, in order to resolve the enigma, witnesses are summoned, experts testify, lawyers argue,

what may be termed an accident to resolve this dispute.   Rather it is sufficient to recognize that death from disease is not an "accidental" death.   This is a proposition that is well-established in the law and does not appear to be disputed by either party.   *See, e.g., Vickers* v. *Boston Mut. Life Ins. Co.*, 135 F.3d 179, 180 (1st Cir. 1998) (explaining that death may be "held to be the result of accident rather than of disease") (citations omitted); *Gay* v. *Stonebridge*, 660 F.3d 58 (1st Cir. 2011) (distinguishing between "accidental" death from trauma and non-accidental death resulting from stroke).   If an accident was not the "sole cause" of Mr. Phan's death or his death results from "in any way" or was contributed to by disease (and more precisely in this case, cardiovascular disease), then Mrs. Phan is not eligible for recovery under the Accidental Death Rider.

*Gay* is helpful in understanding the scope and application of the coverage terms in Mr. Phan's policy.   There, the insurance policy at issue "provided for coverage if the death was caused by an accident 'directly and independently of all other causes,' and denied coverage if the death was caused by an injury 'due to disease, bodily or mental infirmity, or medical or surgical

---

treatises are consulted and even when a conclave of twelve world-knowledgeable individuals agree as to whether a certain set of facts made out an accident, the question may not yet be settled, and it must be reheard in an appellate court." *Wickman* v. *Northwestern Nat. Ins. Co.*, 908 F.2d 1077, 1086-87 (1st Cir. 1990) (quoting *Brenneman* v. *St. Paul Fire and Marine Ins. Co.*, 192 A.2d 745, 747 (Pa. 1963)).

treatment of these.'" *Gay*, 660 F.3d at 60.  The district court
determined (in a ruling that was not challenged on appeal) that
this policy language "required [the plaintiff] to prove that the
skull fracture resulting from the fall was 'the direct cause of
[the decedent's] death independent of any preceding medical
condition; that is, that the fall, as opposed to the stroke, was
the "dominant cause" of her death.'" *Id.* (citations omitted).
Moreover, "because the evidence indicated that more than one
factor contributed to [decedent's] death--the stroke and the
skull fracture--[the plaintiff] bore the burden of separating out
the consequential causes from the inconsequential causes of . . .
death." *Id*.

The language in Mr. Phan's policy, requiring that the
accident be the "sole cause of death" and providing an exclusion
where the loss of life is "in any way results from, or is caused
or contributed to: by . . . physical or mental illness," is at
least as demanding as the language in the policy at issue in *Gay*
requiring that death be caused by accident "independent[] of all
other causes."  To survive summary judgment, Mrs. Phan must at
least clear the hurdle set by the district court in *Gay*.

2.  The Factual Evidence Regarding the Cause of Death

In support of its motion for summary judgment, the Defendant
has offered several pieces of evidence to establish that the
death was caused by cardiovascular disease.  First, the autopsy

report of Dr. Nields lists the "Cause of Death" as "I. Hypertensive and Atherosclerotic Cardiovascular Disease, II. Blunt Trauma to Chest."  This finding was supported in the autopsy report by the finding of a "85-90% stenosis of the proximal left anterior descending coronary artery."  That determination was reiterated in the death certificate issued by the State of Massachusetts, which listed the "Immediate Cause" of death as "Hypertensive and Atherosclerotic Cardiovascular Disease" and indicated that "Blunt Trauma to Torso" was an "other significant condition contributing to death."[9]  Finally, the Defendant's expert corroborates this theory with his opinion. Like Dr. Nields' findings, Dr. Goldman's opinion that "the cause of [Mr. Phan's] death . . . is hypertensive and atherosclerotic cardiovascular disease" is supported by "the finding of severe cardiomegaly . . . and the finding of an '85-90% stenosis of [the] proximal left anterior descending coronary artery.'"

The medical evidence regarding the cause of death is corroborated the circumstantial evidence in the police and emergency room reports, which provide no evidence of a traumatic accident.  The police report indicates that Mr. Phan was found in his car with the airbag undeployed and less than $1,000 damage to the car.  The emergency report from the admitting hospital

---

[9] The Standard Form Certificate of Death indicates that the line for the "Immediate Cause" of death should be filled in with the "Final disease or condition resulting in death."

-14-

indicated that there were "no obvious signs of trauma" and "no open wounds."

To rebut this evidence, Mrs. Phan relies primarily on two sources.  First, she points to the statement in the autopsy report of Dr. Nields which indicates that the "manner of death" was an "Accident (Driver of Motor Vehicle Drove Off Highway Into a Wooded Area.)"  This single statement in the autopsy report, however, cannot be considered out of context.  Taken as a whole, the autopsy report clearly conveys Dr. Nields' opinion that one of the "cause[s] of death" (and, indeed, the primary, if not only, one), was cardiovascular disease.[10]

The second, and more substantial piece of evidence, is the expert opinion of Dr. Belliveau.  In his declaration, Dr. Belliveau opined that "Mr. Phan died accidentally due to blunt trauma causing a sudden and unexpected cardiac event in reaction to his vehicle leaving the road."

For two reasons, that opinion is insufficient to avoid summary judgment.  First, assuming that the events occurred precisely as Dr. Belliveau described them, the sequence describes a death that was contributed to by cardiac disease.  In *Vickers*,

---

[10] I note, of course, that this opinion is not necessarily determinative.  *See Vickers* v. *Boston Mutual Life Ins. Co.*, 135 F.3d 179, 180 (1st Cir. 2008) (In an autopsy report, the state medical examiner "choosing between 'Natural' and 'Accident,' [for the manner of death] . . . chose 'Accident.'  Whether this was an accident within the policy terms, however, depends upon the policy terms.")

135 F.3d at 181 (citing *Bohaker* v. *Travelers' Insurance Co.*, 102

N.E. 342, 344 (Mass. 1913)), the First Circuit explained:

> A sick man may be the subject of an accident, which but
> for his sickness would not have befallen him.  One may
> meet his death by falling into imminent danger in a
> faint or in an attack of epilepsy.  But such an event
> commonly has been held to be the result of accident
> rather than of disease.

However, if the converse occurs and an accident[11] triggers a

fatal episode of disease, the ultimate fatality is "caused or

contributed to" by disease, rather than by (or, at very least, as

well as by accident).  In this setting, an accident is not the

"sole cause" of death.  The converse is what Dr. Belliveau

postulates; that some accident precipitated an episode of fatal

cardiovascular disease.  This is explained succinctly in a

colloquy during Dr. Belliveau's deposition:

> Q:   . . . [Y]ou think Mr. Phan was sort of scared to
>      death and had a heart incident?
>
> A:   Yes.
>
> Q:   That was the cause of his death?
>
> A:   Yes.
>
> Q:   And your position is that that's an accidental
>      death?
>
> A:   Yes.

---

[11] I assume for present purposes that the incident may be
characterized as an accident despite the blanks in the record
regarding the circumstances.  *See* Note 2, *supra*, and accompanying
text.

Q:    But whatever was found in autopsy in terms of
      heart defects, that certainly contributed to his
      coronary event?

A:    Yes.

This testimony, from the plaintiff's own expert, shows that heart

disease was at least a contributing factor to Mr. Phan's death.[12]

The facts asserted by Dr. Belliveau are distinguishable from

those in *Vickers*.  In *Vickers*, the decedent suffered a heart

attack which, alone, was insufficient to cause the decedent's

death.  That heart attack, however, precipitated a fatal car

crash.  *Vickers*, 135 F.3d at 180 ("The undisputed facts are that

---

[12] Under similar circumstances, where a policy provided for coverage "only if the death of the insured results as a consequence of bodily injury effected solely through external, violent, and accidental means within sixty days after such injury independently and exclusively of all other causes" and would "not be payable if the death of the insured results directly or indirectly from disease or from bodily or mental infirmity," the Massachusetts Supreme Judicial Court has denied coverage where a doctor, called by the plaintiff, "agreed that 'the disease of the heart actively cooperated with the accident to cause this death,' a statement which, if believed, showed that the heart disease was sufficiently a cause of the insured's death to make it a 'contributing' cause, so that the injuries could not be the sole cause 'independently of all other causes.'" *Brown* v. *U.S. Fidelity & Guaranty Co.*, 147 N.E.2d 160, 161-163 (Mass. 1958). *See also Howe* v. *National Life Ins. Co.*, 72 N.E.2d 425 (Mass. 1947) (denying coverage under policy requiring that fatality result "from bodily injury effected solely and exclusively by violent, external, and accidental means" "independently of all other causes" where evidence showed death resulted from "joint operation of a pre-existing disease and an accident"); *Bouchard* v. *Prudential Ins. Co. of America*, 194 A. 405, 406-07 (Me. 1937) (denying coverage death for death resulting from combination of heart disease and physical blows under exclusion for loss of life resulting "directly or indirectly from bodily or mental infirmity or disease in any form").

the crash was caused by Vicker's heart attack, but the sole physiological cause of death was the physical injury sustained in the crash.  The heart attack alone would not have been fatal.").

Taking as true Dr. Belliveau's assumption that some accident occurred and precipitated a heart attack, Dr. Belliveau's testimony is that the accident alone was not a fatal one. Rather, the immediate and consequential cause of death was a coronary event caused by disease.  The logic of *Vickers* dictates that such a fatality is one caused by disease, not by accident.[13]

Dr. Belliveau's opinion is insufficient for a second reason. While he postulates that Mr. Phan's cardiac event was brought about by a preceding accident, the Plaintiff has set forth no evidence that any such accident actually took place.  Dr. Belliveau was able to say only that Mr. Phan's cardiac event was "concurrent to his leaving the road," and he was unable to rule out the possibility that "the cardiac event caused [Mr. Phan] to lose control of his vehicle" resulting in Mr. Phan veering off

---

[13] The present case is distinguishable from *Vickers* v. *Boston Mut. Life Ins. Co.*, 135 F.3d 179 (1st Cir. 1998) in another way.  The exclusion in the insurance policy in *Vickers* provided that "[n]o benefit will be paid for loss resulting from . . . [s]ickness, disease or bodily infirmity."  *Id.* at 180. This is a narrower exclusion than that in Mr. Phan's policy which excludes coverage where death "in any way results from, or is caused or contributed to by" illness.  *See Louis* v. *Genworth Life and Health Ins. Co.*, 2008 WL 4450264 (D. Mass. 2008) (distinguishing *Vickers* and explaining that a "if [plaintiff's pre-existing] condition played any role in his fall, it would also be consistent with a layman's understanding to say that his condition *contributed* to his disability") (emphasis in original).

the road.[14]   In his declaration, Dr. Belliveau explains that

"[d]eath from cardiovascular disease may be associated with

accidental circumstances."   The possible association of events,

---

[14] Dr. Belliveau's testimony was as follows:

Q.   So is it your testimony that you don't know whether Mr. Phan
     had a cardiac event that caused him to leave the road or
     that it happened after he left the road?

A.   My opinion is that he had a cardiac event which caused him
     to -- concurrent to his leaving the road. I believe he had a
     reaction to the loss of control of his vehicle.

Q.   Well, it is possible, is it not, that the cardiac event
     caused him to lose control of his vehicle?

A.   Anything is possible.

Q.   Can you rule that out?

A.   Not absolutely, no.

Q.   Well, do you rule it out?

A.   No.

Q.   And again, based on the opinions that you have formulated in
     this case, would you have filled the certificate of death
     out differently than Dr. Nields filled it out?

A.   No.

. . .

A.   . . . It is my opinion that he lost control of his vehicle
     and the experience of that caused him to have a cardiac
     event.

Q.   What's the basis of that?

A.   My opinion.  My experience.

however, does not demonstrate that such is the case here.[15]

The trial court in *Gay* v. *Stonebridge Life Ins. Co.*, 585 F.Supp.2d 171 (D. Mass. 2008), was faced with a situation that is instructive here.  There, the defendants presented evidence, in the form of a death certificate and testimony from the physician performing the autopsy, indicating that the cause of death was a stroke--which neither side denied fell outside of the accidental coverage policy.  *Id.* at 173-74.  The claim survived summary judgment, however, because the plaintiff was able to present evidence showing that the decedent fell, striking her head and fracturing her skull, and that this head trauma resulting from "a trip and fall" was sufficient alone to explain the medical evidence surrounding the insured's demise.  *Id.* at 174. Nevertheless, judgment was ultimately entered for the insurer after trial.  *Gay* v. *Stonebridge*, 660 F.3d 58.

---

[15] Both parties' experts agree that the liver injury noted in the autopsy report was insufficient to have caused Mr. Phan's death and that it did not precede the cardiac event.  As Dr. Belliveau explained: "[i]f his heart had been beating, given the degree of the laceration, there would have been a massive bleed into the abdomen.".  For much this reason, plaintiff appears to have abandoned its earlier theory, set forth in its Chapter 93A demand letter, that trauma to the liver was the cause of death.

Faced with a similar absence of evidence regarding the cause of an alleged accident (arising in the context of deferential ERISA review), the First Circuit rejected as "speculation" a claimant's suggestion that an "accident could have been caused by an attempt to avoid a collision with another vehicle or with an animal."  *Stamp* v. *Metropolitan Life Ins. Co.*, 531 F.3d 84, 94 (1st Cir. 2008).

Here, in contrast, Mrs. Phan has failed to show evidence of some accident sufficiently grave to cause Mr. Phan's death, while MetLife has provided ample evidence that his death was caused by cardiovascular disease.  On such a record, it would be simply impossible for any reasonable jury to conclude that Mr. Phan's death was caused by an accident.

### 3.   The Covenant of Good Faith and Fair Dealing

The failure to present sufficient evidence of a breach of contract dooms Mrs. Phan's claim for a breach of the covenant of good faith and fair dealing as well.  Under Massachusetts law, the covenant of good faith "may not . . . be invoked to create rights and duties not otherwise provided for in the existing contractual relationship, as the purpose of the covenant is to guarantee that the parties remain faithful to the intended and agreed expectations of the parties in their performance."  *Uno Restaurants* v. *Boston Kenmore Realty Corp.*, 805 N.E.2d 957, 964 (Mass. 2004).[16]

Because MetLife had no obligation to pay the claims under the terms of the "Accidental Death Rider" to Mr. Phan's insurance

---

[16] Similarly, under Rhode Island law, a bad faith insurance claim "does not exist until the plaintiff first establishes a breach of contract." *Wolf* v. *Geico Ins. Co.*, 682 F. Supp. 2d 197, 198 (D.R.I. 2010).  *See also Lamoureaux* v. *Merrimack Mut. Fire Ins. Co.*, 751 A.2d 1290, 1293 (R.I. 2000) (per curiam) ("Before a bad-faith claim can even be considered, a plaintiff must prove that the insurer breached its obligation under the insurance contract.").

policy, the covenant of good faith and fair dealing cannot be invoked to impose liability based upon MetLife's denial of Mrs. Phan's claims.

## C. *Massachusetts General Law Chapter 93A*

Although Mrs. Phan asserts a range of allegations in support of her claim under Mass. Gen. Laws c. 93A, those allegations can be classified as falling into two categories: (1) bad faith and unfair refusal to pay benefits owed under the Accidental Death Rider; and (2) selling a life insurance policy that failed to meet the standards required by Massachusetts law.

The first of these fails for essentially the reasons the claims for breach of contract and breach of the covenant of good faith and fair dealing fail.  Under Massachusetts law, Chapter 93A does not apply where the parties are engaged in a good faith dispute regarding the meaning of a contract.  *Spence* v. *Berkshire Life Ins. Co.*, 561 F. Supp. 2d 126, 130 (D. Mass. 2008).  *See also Duclersaint* v. *Fed. National Mortgage Ass'n*, 696 N.E.2d 536, 540 (Mass. 1998) ("[A] good faith dispute as to whether money is owed, or performance of some kind is due, is not the stuff of which a c. 93A claim is made.").  Having prevailed on the contract claim, it is clear that MetLife's position was a good faith and reasonable one, and accordingly, MetLife's denial of Mrs. Phan's claim does not violate Chapter 93A.  *See Graham v. Malone Freight Lines*, 948 F. Supp. 1124, 1139 (D. Mass. 1996)

(Chapter 93A claim was invalid where insurer had "good faith basis" for refusing to settle claim "since liability was not reasonably clear.").

As to the second category of alleged Chapter 93A violation, beyond alleging that the insurance policy sold by MetLife was unfairly ambiguous--an allegation disposed of by the discussion above--Plaintiff has failed to set forth reasons that MetLife's policy is unsatisfactory.  Summary judgment is the moment in a case when litigants must show that their claims have evidentiary support.  *See Maldonado-Denis* v. *Castillo-Rodriguez*, 23 F.3d 576, 581 (1st Cir. 1994) ("[A] party opposing summary judgment must 'present definite, competent evidence to rebut the motion.'") (quoting *Mesnick* v. *General Elec*. *Co.*, 950 F.2d 816, 822 (1st Cir. 1991)).  Because the Plaintiff has failed to do so here, summary judgment is appropriate.

### IV.   CONCLUSION

For the reasons set forth more fully above, defendant's motion for summary judgment, Dkt. No. 25, is GRANTED.


*/s/ Douglas P. Woodlock*
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT